UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDERL MOORE, TIARA WILLIS-
PITTMAN, CHINITA TERRY, and            No. 2:14-cv-11903
JOHN CONYERS, Jr.,

                                       HON. MATTHEW J. LEITMAN
        Plaintiffs,
v                                      MAG. MONA K. MAJZOUB

RUTH JOHNSON, in her official capacity
as Secretary of State, and CATHY M.        **DEFENDANT JOHNSON'S**
GARRETT, in her individual capacity and    **RESPONSE TO PLAINTIFFS'**
in her official capacity as Wayne County   **MOTION FOR TEMPORARY**
Clerk,                                     **RESTRAINING ORDER**

        Defendants.

_____/

| | |
|---|---|
| Michael J. Steinberg (P43085) | Mary Ellen Gurewitz (P25724) |
| Kary L. Moss (P48759) | Cooperating Attorney, ACLU Fund of Michigan |
| Daniel S. Korobkin (P72842) | Attorney for Plaintiffs Moore, Willis-Pittman |
| Brooke A. Merriweather-Tucker | 2211 East Jefferson Ave, Ste 200 |
| Attorneys for Plaintiffs | Detroit MI  48207 |
| ACLU Fund of Michigan | 313.965.3464 |
| 2966 Woodward Ave | |
| Detroit MI  48201 | |
| 313.578.6814 | |
| | |
| Erik A. Grill (P64713) | John D. Pirich (P23204) |
| Denise C. Barton (P41535) | Andrea L. Hansen (P47358) |
| Assistant Attorneys General | Honigman, Miller |
| Attorneys for Defendant Johnson | Attorney for Plaintiff Conyers |
| P.O. Box 30736 | 222 N. Washington Square, Suite 400 |
| Lansing, Michigan  48909 | Lansing MI  48933-1800 |
| 517.373.6434 | 517.377.0710 |
| | |
| Janet Anderson-Davis (P29499) | Eric E. Doster (P41782) |
| Wayne County Corporate Counsel | Foster, Swift |
| Attorney for Defendant Garrett | Attorneys for Proposed Intervenor Defendants |
| 600 Randolph, Suite 253 | Jones & Sheffield |
| Detroit MI  48226 | 313 S. Washington Square |
| 313.224-5030 | Lansing MI  48933-2193 |
| _____/ | 517.371-8200 |

## DEFENDANT JOHNSON'S RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Bill Schuette
Attorney General

Erik A. Grill (P64713)
Denise C. Barton (P41535)
Assistant Attorneys General
Attorneys for Defendant Johnson
P.O. Box 30736
Lansing, Michigan  48909
Dated:  May 20, 2014            517.373.6434

**CONCISE STATEMENT OF ISSUES PRESENTED**

1. Are Plaintiffs entitled to a Temporary Restraining Order enjoining the enforcement of Michigan's residency requirement in Mich. Comp. Laws § 168.544c(3) based on Plaintiffs' allegation that the requirement violates the First Amendment when their claim is potentially barred by mootness and where Plaintiffs have not met the requisite requirements for the issuance of a Temporary Restraining Order?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>Authority</u>:

*Miyazawa v. City of Cincinnati*, 45 F.3d 126 (6th Cir. 1995)
*Citizens for Tax Reform v. Deters,* 518 F.3d 375 (6th Cir. 2008)
*Timmons v. Twin Cities Area New Party,* 520 U.S. 351; 117 S. Ct. 1364; 137 L. Ed. 2d 589 (1997)
*Libertarian Party of Ohio v. Husted*, 2014 U.S. App. LEXIS 8216 (Docket No. 14-3230, decided May 1, 2014)
*Purcell v. Gonzalez*, 549 U.S. 1 (2006)

Fed. R. Civ. P. 65(b)

M.C.L. 168.544c

# INTRODUCTION

On May 12, 2014, Plaintiffs Moore and Willis-Pittman filed a complaint for declaratory and injunctive relief against Defendant Secretary of State Ruth Johnson and others, challenging on both facial and as-applied bases, the registration requirement in M.C.L. 168.544c(3).  (R. 1, Compl., Pg ID #1-23.)  Then, on May 15, 2014, Plaintiffs filed an amended complaint, which added Plaintiffs Terry and Conyers as parties and raised additional allegations for each.  (R. 12, Am. Compl., Pg ID #44-87.)  The next day, Plaintiffs filed a motion for temporary restraining order and/or preliminary injunction.  (R. 15, Pls. Mot., Pg ID #126-179.)  Pursuant to a previously held telephonic status conference, the Court scheduled a hearing on the motion for May 21, 2014 and called for Defendants to respond by May 20, 2014 at 10:00 a.m..  (R. 17, Notice, Pg ID #181.)  Plaintiffs' request for a TRO and preliminary injunction should be denied.

# STATEMENT OF FACTS

Rep. John Conyers, Jr. has been elected to the U.S. House of Representatives from Michigan over 25 times.  In order to qualify for placement on the primary ballot for a political party, a candidate must file nominating petitions bearing the requisite number of valid signatures.  M.C.L. 168.133.  To be eligible to have his or her name printed on the ballot, a candidate for the office of United States Representative in Congress must file an affidavit of identity and nominating

petitions bearing the signatures of at least 1,000 but no more than 2,000 voters residing in the congressional district.  M.C.L. 168.133, 168.544f.  The filing deadline for candidates seeking the office of U.S. Representative in Congress elapsed at 4:00 p.m. on the fifteenth Tuesday before the August 5, 2014 primary election, or April 22, 2014.  M.C.L. 168.133. The official responsible for the receipt and canvass of nominating petitions filed by congressional candidates whose electoral district lies wholly within a single county is the county clerk.  *Id*. Because the thirteenth congressional district lies wholly within Wayne County, the Clerk of Wayne County is the filing official responsible for performing these duties.

On information and belief, on April 18, 2014, Congressman John Conyers, Jr. timely filed an affidavit of identity and nominating petition containing the signatures of approximately 2,029 individuals with the Wayne County Clerk. Upon receipt of a candidate's nominating petitions, the city clerk is authorized to review and investigate "the validity of the registration or genuineness of the signature" appearing on the petitions by comparison against original registration records or the Qualified Voter File (QVF).[1]  M.C.L. 168.552(3).  This review includes the registration status and signatures of voters who execute nominating petitions and the circulators of those petitions.  Pursuant to M.C.L. 168.544c(3),

_____

[1]  The QVF contains the names, addresses, and other identifying information for all individuals who are registered to vote in Michigan.  MCL 168.509q.

"[a]t the time of circulation, the circulator of a petition shall be a registered elector of this state.  At the time of executing the certificate of circulator, the circulator shall be registered in the city or township indicated in the certificate of circulator on the petition."  Thus, at the time of gathering signatures on a nominating petition, the circulator need only be registered to vote in the State of Michigan, not the electoral district that the candidate seeks to represent.  (Attachment 1, Affidavit of Michigan Bureau of Elections Director, Christopher M. Thomas).  According to the Qualified Voter File (QVF), which contains the names, addresses, and other identifying information for all individuals who are registered to vote in Michigan, as of May 11, 2014, there are approximately 7,401,052 individuals who are registered to vote in Michigan,[2] and were thus eligible to circulate nominating petitions.

A person may file a sworn complaint challenging the registration status and genuineness of signatures appearing on a petition within 7 days of the filing deadline.  M.C.L. 168.552(2).  A complaint lodged under this provision must identify the specific signatures against which a challenge is made.  *Id*.  On information and belief, Richard Jones timely filed a sworn complaint challenging the sufficiency of Congressman Conyers' nominating petition on April 29, 2014 with the Wayne County Clerk, questioning the validity of approximately 1,266 of the

---

[2] www.mi.gov/vote (viewed May 12, 2014), attached as Attachment 2.

signatures submitted by Congressman Conyers.  The county clerk must prepare and release a staff report indicating the outcome of a challenge and whether a nominating petition contains a sufficient number of valid signatures at least two business days in advance of announcing the clerk's final determination.  M.C.L. 168.552(5).  The county clerk's official declaration regarding sufficiency must be made "immediately" after the clerk's examination has concluded.  M.C.L. 168.552(6).

A person feeling aggrieved by a determination made by the county clerk may have the determination reviewed by the secretary of state by filing a written request with the secretary of state within 3 days after the official declaration of the county clerk.  M.C.L. 168.552(6).  Or, a person feeling aggrieved by the county clerk's determination may elect to file "a mandamus, certiorari, or other appropriate remedy in the circuit court."  *Id*.

On May 13, 2014, the Wayne County Clerk officially declared that as a result of Mr. Jones's challenge, Congressman Conyers submitted an insufficient number of valid signatures to qualify for placement on the August primary ballot. On May 14, 2014, Horace Sheffield III and Richard Jones submitted a letter to the Secretary of State claiming to be "individuals feeling aggrieved by a determination

of the Wayne County Clerk," on the basis that the clerk refrained from invalidating hundreds of other signatures challenged by Mr. Jones.[3]

On May 16, 2014, Congressman Conyers timely filed an appeal of the Wayne County Clerk's determination with the Secretary of State. The appeal seeks "a complete review and reversal" of all 1,408 signatures invalidated by the Wayne County Clerk.

With respect to Congressman Conyers' appeal, the Secretary of State is currently reviewing the petitions, signatures, and other relevant documents. The Secretary of State is utilizing the QVF in its review of the 1,408 signatures invalidated by the Wayne County Clerk. The review will include an examination of any pertinent records of the Secretary of State, including branch office records or electronic records of transactions involving a person's change of address or application to register to vote that may have been processed by the Secretary of State.

The Secretary of State will prepare and release a staff report of its findings. Although the Michigan Election Law does not establish a formal deadline for concluding its review of the appeal, the Secretary of State will complete its work as

---

[3] On May 18, 2014, Horace Sheffield and Richard Jones timely filed their response to the Plaintiffs' Motion for Preliminary Injunctive Relief. (R. Sheffield/Jones's Resp., Pg ID #376-551.)

prudently and expeditiously as possible.  (Att.1, Thomas Aff. ¶18).  Indeed, the review is already underway.

If the Secretary determines that Representative Conyers has not submitted sufficient number of valid signatures, he may—as a person who filed a nominating petition and feels aggrieved by the determination of the secretary of state—then have the Secretary's determination reviewed by mandamus, certiorari, or other appropriate remedy in the circuit court.  M.C.L. 168.552(6).

Ballots for the general election are prepared and furnished by the Board of County Election Commissioners.  M.C.L. 168.559.  Ballot printing by counties commences promptly after the Secretary of State certifies the federal, state, and judicial offices for which candidates are to be nominated, which must occur no later than the 60th day prior to the primary election, or by June 6, 2014.  M.C.L. 168.552(14).  Absent voter ballots must be delivered to the county clerk at least 47 days in advance of the primary election, or by June 19, 2014.  M.C.L. 168.713. The county clerk must distribute absent voter ballots to city and township clerks by the 45th day prior to Election Day, or by June 21, 2014.  M.C.L. 168.714. Additionally, absent voter ballots must be transmitted to military and overseas voters who have previously submitted a ballot request by that date.  M.C.L. 168.759a.  As is clear from the timetable that has already been established, the

2014 election cycle is underway in Michigan for candidates seeking local, state, and federal offices, including those participating in this lawsuit.

## ARGUMENT

### I.    Plaintiffs' claims may become moot.

Courts lack judicial power to entertain and decide moot cases. *See Los Angeles County v. Plaintiffs*, 440 U.S. 625, 631 (1979). A case is moot where the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. *Id.* Similarly, if events occur that prevent the court from giving meaningful relief, the case is moot and must be dismissed. *Ailor v. City of Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004). "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997).

Plaintiffs' motion focuses on M.C.L. 168.544c's requirement that petition circulators be registered electors. However, that is not the only basis on which Representative Conyers may be determined to have failed to obtain sufficient signatures to appear on the August primary ballot. The Secretary of State is currently undertaking a review of the petitions and signatures submitted, and has not yet determined whether all of the signatures submitted meet the requirements for validity. See e.g. M.C.L. 168.544c(8)-(11). Plaintiffs' own motion states that

the Wayne County Clerk has already determined that over 700 of the signatures submitted were invalid.  If another 237 signatures are found to be invalid for any other reason, then Rep. Conyers' will have failed to obtain a sufficient number of signatures regardless of the registration status of the circulators.

Given the possibility that Plaintiffs' arguments about the constitutionality of the statute may potentially be made moot by other procedural failings of the petition signatures, Plaintiffs should not be permitted to race to the courthouse in order to shortcut the Secretary of State's review.[4]

## II.    Lack of standing bars certain claims.

Plaintiffs claim that registered voters such as Ederl Edna Moore, Tiara Willis-Pittman, and Chinita Terry have standing to challenge the constitutionality of M.C.L. 168.544c(3) because they are registered voters who wish to vote for Congressman Conyers.  For support, Plaintiffs cite mostly non-binding authority from other circuits.  Plaintiffs' claims are strikingly similar to those that have been considered and rejected by the Supreme Court, the Sixth Circuit, and this Court. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (no standing for Los Angeles resident challenging police department's chokehold policy because

_____

[4] There have been other procedural challenges to Plaintiffs' claims for injunctive relief, such as laches and unclean hands.  Since Representative Conyers appears to have followed the statutory requirements for years, Secretary of State Johnson believes that laches may apply.  However, the Secretary does not take any position on the unclean hands arguments, as the Secretary is currently reviewing the petitions.

plaintiff was "no more entitled to an injunction than any other citizen of Los Angeles"); *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 126-28 (6th Cir. 1995) (no standing for resident challenging city charter amendment when she had "suffered no harm, nor will she suffer any greater harm than that of any other voter in the City of Cincinnati"); *Anthony v. State of Michigan*, 35 F. Supp. 2d 989, 1003 (E.D. Mich. 1999) (no standing for Detroit citizens challenging consolidation of Detroit Recorder's Court because plaintiffs did not "articulate how they [were] *particularly* harmed as a result of the merger") (emphasis in original).

Relatedly, to invoke the subject matter jurisdiction of an Article III federal court, each plaintiff "must establish three elements:  (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue…; and, (3) [a] likelihood that the injury would be redressed by a favorable decision of the Court."  *Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. Airborne, Inc.*, 332 F.3d 983, 987 (6th Cir. 2003).  Moreover, Plaintiffs must show standing as to *each* defendant.  See *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) ("To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury *due to the alleged illegal conduct of the defendant…"*) (emphasis added).  (See also *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982)).

In order to bring suit against the Secretary of State, each Plaintiff must allege some actual or threatened injury that is fairly traceable to the actions of *Secretary Johnson*. Plaintiffs cannot establish a connection between their alleged injury and any conduct by the Secretary of State until the Secretary of State completes her administrative review, which is underway. Therefore, at this time, they lack standing to bring their claims against the Secretary.

The overbreadth doctrine creates an exception only to the prudential standing inquiry; as the U.S. Supreme Court has made clear, the injury-in-fact requirement still applies to overbreadth claims under the First Amendment. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (2007) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) ("Even though Prime Media advances an overbreadth challenge, it is thus still required to show an injury in fact)). Thus, Plaintiffs must first have an injury in fact based on the conduct of Secretary Johnson. Because they have failed to demonstrate such a connection, they presently lack standing.

## III.   This court should abstain from hearing Plaintiffs' claims at this preliminary injunction stage on abstention grounds.

Abstention involves "careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the 'independence of state action.'" *Quackenbush v. Allstate Ins Co*, 517 U.S. 706, 728; 116 S. Ct. 1712; 135 L. Ed. 2d 1 (1996) (citing *Burford v. Sun Oil Co*, 319

U.S. 315, 334; 63 S. Ct. 1098; 87 L. Ed. 1424 (1943)).  Under the facts of this case, this Court should abstain from exercising its jurisdiction because the case meets the requirements of the *Burford* abstention doctrine.

The Supreme Court has explained that *Burford* abstention is appropriate where timely and adequate state-court review is available and:  (1) a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 30; 109 S. Ct. 2506; 105 L. Ed. 2d 298, 361 (quotation omitted); see also *Ada-Cascade Watch Co v. Cascade Resource Recovery, Inc*, 720 F.2d 897, 903 (6th Cir, 1983) (stating that *Burford* enunciated two factors which justify abstention:  the presence of a complex state regulatory scheme which would be disrupted by federal review, or the existence of a state-created forum with specialized competence in the particular area).

*Burford* abstention is appropriate here, where the requested relief is injunctive and declaratory, see *Quackenbush*, 517 U.S. at 718-719, and where federal interference would disrupt coordinated administration by the election authorities in Michigan.  The State of Michigan must be able to establish a

11

coherent policy whereby the election officials can thoroughly review the two

appeals that have been filed in connection with the 13th Congressional District

primary election.   The Sheffield/Jones appeal involves a unique state election

issue, i.e., whether a successful challenger has the right to file an administrative

appeal under M.C.L. 168.552 with state election officials in order to assert

alternative grounds upon which to reject an election petition. (Attachment 1,

Thomas Aff., ¶15).   Reverend Horace Sheffield and Richard Jones have filed such

an appeal, which is currently pending before state election officials.   They argue

that M.C.L. 168.544(c) provides additional reasons for rejecting Congressman

Conyers' petition because false statements contained in the circulator petition

provide an adequate and independent ground upon which to disqualify the

Conyers' nomination petition.   Because federal intervention at this stage

potentially interferes with the review and litigation of these important state election

matters, this Court should abstain under *Burford*.

**IV.    Plaintiff has not met the factors for the extraordinary relief of a TRO or preliminary injunction.**

Under Fed. R. Civ. P. 65(b), a temporary restraining order is an

extraordinary remedy whose purpose is "to preserve the status quo so that a

reasoned resolution of a dispute may be had."   *Proctor & Gamble Co. v. Bankers*

*Trust Co*., 78 F.3d 219, 226 (6th Cir. 1996).   The standard for issuance is a high

one.   When evaluating whether to grant a TRO, the court must consider:  "(1)

12

whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a [TRO], (3) whether granting the [TRO] would cause substantial harm to others, and (4) whether the public interest would be served by granting the [TRO]." *Career Agents Network, Inc. v. Careeragentsnetwork.biz*, 2009 WL 1707956 (6th Cir. June 17, 2009) (citing *N.E. Ohio Coal. for the Homeless v. Blackwell,* 467 F.3d 999, 1009) (6th Cir. 2006) (citations omitted). These factors are "interrelated considerations that must be balanced together," not independent prerequisites. *Blackwell*, 467 F.3d at 1009 (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 19991)). The facts here do not warrant issuance of a TRO.

A.     **Plaintiffs do not have a substantial likelihood of success on the merits.**

Plaintiffs have not demonstrated a substantial likelihood of succeeding on the merits on either their facial or as-applied challenges. First, as previously set forth, their claims may end up being moot. Second, Plaintiffs' claims fail on the merits.

1.     **Mich. Comp. Laws 168.544c(3)'s registration requirement is not unconstitutional.**

Plaintiffs cite *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008), in support of their argument that M.C. L. 168.544c(3) is unconstitutional. (R. 5, Mot. for

TRO at ¶¶ 10-12, Pg ID #35.)  But, on these facts, *Nader* is not controlling and does not bind this Court.

First, *Nader* is a fractured decision[5] in a case that presented itself in an "unusual posture," *id.* at 475, contained no evidence, arguments, or analysis of narrow tailoring, *id*. at 475-76, and was decided in the context of qualified immunity in a case seeking monetary damages.  It was not a direct facial challenge to the constitutionality of Ohio's laws.  So, although the Court indicated that it should be treated as any other published decision of the Court, *Nader*, 545 F.3d at 478, its posture compels caution before extending its holding beyond its facts.

Second, the *Nader* court analyzed Ohio's registration and residency requirements together.  *Id.* at 474 ("[T]he question before us is whether Blackwell's application of the two requirements violated Nader's First Amendment rights.")  Indeed, as the Court noted, the findings that Ohio's Secretary of State adopted in striking down Nader's petition, "reflect[ed] her application of both the residency and registration requirements to Nader's circulators."  *Id.*  In this case, Secretary Johnson has taken no action to strike down Plaintiffs' petition.  Also, the lead opinion held that, "Blackwell violated Nader's First Amendment rights when

---

[5] The decision consists of three separate opinions:  a lead opinion by Judge Boggs; separate opinions by Judges Moore and Clay; and Moore and Clay's concurrences in each others' opinions, making those opinions the majority opinion of the court.

he enforced Ohio's *registration and residency* requirements against Nader's candidate-petition circulators."  *Id.* at 475 (emphasis added).

As the Supreme Court has cautioned, there are no litmus-paper tests for deciding when a legitimate ballot-access regulation has crossed the line and impermissibly burdens free speech.  *Nader*, 545 F.3d at 477 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  To the contrary, "[t]he rule is not self-executing and [there] is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  Instead, as the Sixth Circuit has noted, "a particularized assessment of the restriction and the burden it imposes is required."  *Nader*, 545 F.3d at 475.  Moreover, as the Sixth Circuit has further explained, even where a case arises that is sufficiently like a past case, "[a] close analysis of the particular facts of the case is required*." Id.* at 477.

In *Buckley*, the Supreme Court described petition circulation as "'core political speech'" for which First Amendment protection is "at its zenith."  525 U.S. 182, 186-87.  But the Supreme Court also recognized States' substantial interests in regulating elections, deterring fraud, and diminishing corruption in the initiative process.  *Id.* at 206.  The Supreme Court also recognized that "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."  *Id.* at 191.

Drawing on *Buckley*, the Sixth Circuit in *Nader* stated that "petition circulation activity constitutes core political speech and any regulation of that speech is subject to exacting scrutiny."  545 F.3d at 475 (lead opinion) and 478 (Clay, J., concurring in part and concurring in the judgment).  But the Court actually articulated and appeared to have applied a less exacting standard than strict scrutiny.  Justice Moore's concurrence held that Ohio's residency restriction "severely limit[ed] political speech" and was "not justified by a *sufficient* state interest."  *Id.* at 478 (Moore, J., concurring; Clay, J., joining in the opinion) (emphasis added).  And while the lead opinion noted that Ohio's "interest in permitting greater amounts of speech" was the same for residency as for registration, *id.* at 476, the Court concluded as it did based on the facts before it.  It clearly concluded that Blackwell's application of Ohio law to Nader's petition indeed regulated core political speech precisely because it "sharply limited Nader's ability to convey his message to Ohio voters *and thereby* curtailed Nader's core political speech."  *Id.* at 475 (emphasis added).  Additionally, the Court noted, "No case has been put forward *in this litigation* as to a compelling state interest in permitting unregistered Ohioans to circulate petitions but not unregistered citizens of other states."  *Id*. at 476 [emphasis added].

Because of the divided nature of *Nader* and the emphasis placed on the facts and arguments presented in it, this Court should engage in an independent analysis

16

of the constitutionality of Michigan's circulator registration requirements.  In

*Citizens for Tax Reform v. Deters,* 518 F.3d 375, 380 (6th Cir. 2008), the Sixth

Circuit analyzed a restriction on how petition circulators may be paid under the

framework the Supreme Court set forth in *Timmons v. Twin Cities Area New Party,*

520 U.S. 351; 117 S. Ct. 1364; 137 L. Ed. 2d 589 (1997):

> When deciding whether a state election law violates *First* and
> *Fourteenth Amendment* associational rights, we weigh the character
> and magnitude of the burden the State's rule imposes on those rights
> against the interests the State contends justify that burden, and
> consider the extent to which the State's concerns make the burden
> necessary. Regulations imposing severe burdens on plaintiffs' rights
> must be narrowly tailored and advance a compelling state interest.
> **Lesser burdens, however, trigger less exacting review, and a
> State's important regulatory interests will usually be enough to
> justify reasonable, nondiscriminatory restrictions.** No bright line
> separates permissible election-related regulation from unconstitutional
> infringements on *First Amendment* freedoms.

(quoting *Timmons,* 520 U.S. at 358-59) (emphasis added).  While the Court

ultimately found that the burden outweighed the state interests in that case, the

sliding scale employed would more adequately address the competing interests

presented in this case than the analysis in *Nader.*  As the Sixth Circuit just recently

noted in *Libertarian Party of Ohio v. Husted*, 2014 U.S. App. LEXIS 8216

(Docket No. 14-3230, decided May 1, 2014), "facts are not insignificant in

determining the outcomes of First Amendment cases."  *Husted*, at *45.  The Sixth

Circuit then analyzed a challenge to disclosure requirements for petition circulators

under the sliding scale analysis offered by the Supreme Court in other cases.

17

*Husted,* at *45-46 (quoting *Deters,* 518 F.3d at 383).  While *Husted* concerned

disclosure requirements instead of a registration requirement of the kind at issue

here, the Sixth Circuit's use of the sliding scale approach for a First Amendment

challenge is instructive.  For the reasons that follow, the factual differences

presented in this case make a direct comparison to the *Nader* decision impossible

and favor the State's interests over the lesser burdens involved in the statutory

restrictions.

    *Nader* involved petition circulation for a United States presidential

candidate, and was required to collect the signatures of at least 5,000 Ohio voters

in order to secure a place on the 2004 general election ballot.  *Id*. at 462.  By their

nature, presidential petitions are national campaigns requiring a large, coordinated,

and organized effort in various states.  Significantly, Michigan's Legislature

responded to *Nader* by amending § 168.544c(3) to create exceptions to the

registration requirement for candidates without political party affiliation running

for the statewide offices of president of the United States, United States senator,

governor, attorney general, secretary of state, state board of education, board of

regents of the university of Michigan, board of trustees of Michigan state

university, board of governors of Wayne state university, and justices of the

supreme court."  See § 168.544c(3), referring to M.C.L. 168.590b; see also 2014

P.A. 94.  Significantly, candidates without political party affiliation seeking these

offices must circulate qualifying petitions to obtain between 30,000 and 60,000 valid signatures within a period of 180 days prior to filing, with at least 100 signatures belonging to individuals who are registered to vote in each of at least half of the State's congressional districts.  M.C.L. 168.590b, 168.544f.

In contrast, Representative Conyers needs to obtain only 1,000 valid signatures from individuals who are registered to vote in the geographically compact territory of the congressional district.  Additionally, the election in which Plaintiffs seek to participate is for a national elected office, the logistics of the election are essentially local in nature; the logistics and organization required for such candidate petitions are generally less complicated, and it is generally easier for a candidate to attract qualified circulators.  As such, the circulator requirements at issue here are not the same as those in *Nader*.  Indeed, the geographic area of the voting jurisdiction here is contained within the Metro Detroit area, without the statewide or nationwide logistic implications involved in the *Nader* case.

The threshold of 1,000 signatures from one congressional district is decidedly less arduous than the threshold *Nader* faced for presidential candidacy. *Krislov v. Rednour*, 226 F.3d 851, 860 (7th Cir. 2000) ("The uncontested record indicates that their ballot access took a lot of time, money and people, which cannot be characterized as minimally burdensome.")  Thus, *Nader's* concern over Nader's "ability to convey his message to Ohio voters" such that his core political

speech was curtailed, *Nader*, 545 F.3d at 475, does not carry the same weight on the facts asserted here. Indeed, on these facts, the registration requirement does not "drastically reduce[ ] the number of persons, both volunteer and paid, available to circulate petitions." *Id.* at 474 (citing *Buckley v. American Constitutional Law Found., Inc*., 525 U.S. 182, 193 (1999)). Here, Rep. Conyers is able to draw upon a registered voting population of 7,401,052 Michigan residents to circulate his petitions.

Finally, the State has considerably more authority to require that candidates demonstrate a modicum of support in order to help construct an organized and manageable ballot. Part of that modicum of support is getting some registered voters to circulate petitions. That burden is not impermissibly severe where congressional candidates are only required to submit 1000 valid signatures—especially given that 98% of Michigan residents over the age of 18 are registered voters. And Michigan Election Law imposes no geographic distribution requirements on congressional candidates—all of the signatures may be obtained from one area within the 13th district. With over 7.4 million registered electors, candidates seeking office in Michigan are particularly capable of recruiting a number of circulators to assist in the effort. *See Bogaert v. Land*, 572 F. Supp. 2d 883, 901-902 (W.D. Mich, 2008) (citing *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000)).

Moreover, if strict scrutiny is required, the burden on Plaintiffs is justified by the State's compelling interest in preventing fraud.  Under M.C.L. 168.544c, the circulator of a nominating petition must personally witness each voter affix his or her signature to the petition, question each signer regarding their qualification (i.e., voter registration status) to sign the petition, and sign and date the certificate of circulator attesting to these matters.  Requiring the circulator of nominating petitions to be registered to vote in Michigan enables the filing official to readily locate the circulator if questions arise regarding the validity or genuineness of signatures.  A person who makes a false statement in the certificate of circulator may be referred for criminal prosecution.  M.C.L. 168.544c(12).

In its role as the staff of the Board of State Canvassers, the Bureau of Elections is currently canvassing nominating petitions filed by candidates seeking federal, state, and judicial offices in advance of the August 5, 2014 primary election.  As of this writing, the Bureau of Elections has found nominating petitions filed by three candidates that appear to contain signatures that are forged or otherwise fraudulent.  (Att. 1, Thomas Aff. ¶ 21).  As its examination of these nominating petitions continues, it may become necessary to contact the circulators for questioning or appropriate enforcement action, including criminal prosecution for violations of M.C.L. 168.544c(11).  Ensuring that circulators are registered to vote in Michigan enables election officials and law enforcement authorities to

readily locate and exert jurisdiction over circulators in suitable cases.  In the absence of a legal obligation to register, a person who has the intent to deceive may forge the signatures of actual voters and sign a fictitious name in the certificate of circulator, thereby concealing his or her true identity and evading responsibility for the crime.

The state has an interest in providing orderly elections among candidates with a modicum of popular support.  Even if Ohio had a similar interest in *Nader*, it was not as directly connected to the registration and residency requirements, and the resulting burden outweighed any such interest.  Here, the interest is stronger and the burden is significantly lower.  In fact, Congressman Conyers needs only to secure 1,000 signatures, as compared to the requirement in *Nader*, which required five times as many signatures in order to appear on the ballot.  Michigan's statutory requirement that petition circulators congressional candidates be registered voters differs from the facts of the *Nader* decision and is not unconstitutional.

### B.     Plaintiffs have not established irreparable harm.

Plaintiffs have not established that they will be irreparably harmed by the challenged registration provision.  As mentioned earlier, there may be other reasons that Rep. Conyers will have failed to file a sufficient number of signatures.  If those petitions or signatures are invalid for other reasons, then the Plaintiffs will

not have been irreparably harmed by the enforcement of M.C.L. 168.544c. The option of running as a write-in candidate remains available to Representative Conyers even if his name does not appear on the ballot. The Secretary of State should be allowed to complete her review before Plaintiffs run to the courthouse to prevent the operation of a statute that may not ultimately be the source of their woe.

### C.   A TRO/Preliminary Injunction will cause harm to the orderly running of the upcoming primary election.

As stated earlier, courts have recognized that interests in proceeding with an election increase in importance as deadlines have been set and decisions have already been made. See *Nader*, 230 F.3d at 834; see also *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes"). *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls.") The relief Plaintiffs seek from this Court—and appellate review, if granted—will be detrimental to the State's ability to conduct an orderly general election. Plaintiffs' sought-after TRO would heavily prejudice voters and other candidates, who will face the uncertainty of who will actually be on the ballot.

As a general rule, a state has the authority to organize its election ballot. *United States v. Classic,* 313 U.S. 299; 61 S. Ct. 1031; 85 L. Ed. 1368 (1941). The

Sixth Circuit has held that states "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election and campaign related disorder." *Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 585 (6th Cir. 2006). State ballot restrictions can prevent "the clogging of [a state's] election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections....Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Green Party v. Hargett*, 953 F. Supp. 2d 816, 849 (M.D. Tenn., June 17, 2013) (quoting *Bullock v. Carter*, 405 U.S. 134, 145; 92 S. Ct. 849; 31 L. Ed. 2d 92 (1972)).

These same interests in defending against frivolous or fraudulent candidacies, voter confusion, and the "clogging" of the election machinery are at stake here.

### D.    A TRO would be contrary to the public interest.

For the same reasons, a temporary restraining order or preliminary injunction enjoining M.C.L. 168.544c(3)'s registration requirement is also contrary to the public interest. Any midstream changes are confusing to candidates and voters alike. And such a change is unfair to candidates who have already followed the challenged law and complied with its registration requirement. There is a

substantial public interest in an orderly election, and that interest will be harmed by changing the rules in the middle of a campaign.

## CONCLUSION AND RELIEF REQUESTED

In sum, Plaintiffs' claim is potentially barred by mootness, lack of standing and they have not met the factors that justify the extraordinary relief they seek: immediate action to restrain and enjoin Defendant Secretary of State Johnson from enforcing and implementing any and all provisions of M.C.L. 169.544c(3) that require circulators of nominating petitions to be registered voters.

For these reasons, Secretary of State Ruth Johnson respectfully requests that this Honorable Court deny the motion for temporary restraining order and/or preliminary injunction, together with any other relief the Court determines to be appropriate under the circumstances.

Respectfully submitted,

Bill Schuette
Attorney General

*/s/Erik A. Grill*
Erik A. Grill (P64713)
Denise C. Barton (P41535)
Assistant Attorneys General
Attorneys for Defendant Johnson
P.O. Box 30736
Lansing, Michigan  48909
Dated:  May 20, 2014                                    517.373.6434

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2014, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record, as well as via US Mail to all non-ECF participants.

*/s/Erik A. Grill*
Erik A. Grill (P64713)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434
